(No. 41568.—

THE PEOPLE *ex rel.* Edmund J. Kucharski, County Collector, Appellee, *vs.* LAWRENCE McGOVERN, Appellant.

*Opinion filed January 29, 1969.—Rehearing denied March 25, 1969.*

SPRAY, PRICE, HOUGH & CUSHMAN, and HOLT & KEARNEY, both of Chicago, (ROBERT S. CUSHMAN, and JOHN M. BETTS, of counsel,) for appellant.

JOHN J. STAMOS, State's Attorney, ALAN S. GANZ, and HINSHAW, CULBERTSON, MOELMANN & HOBAN, all of Chicago, (THOMAS J. WITHERS, JOHN G. LONGHENRY, JR., and RICHARD L. MATHIAS, of counsel,) for appellee.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

The circuit court of Cook County overruled the objections filed by the taxpayer, Lawrence McGovern, to the application of the county collector for judgment and order of sale for nonpayment of 1966 taxes, and to determine the correct amount of those taxes paid under protest. The objections relate to taxes levied by the Forest Preserve District of Cook County. The revenue is involved, and the taxpayer has appealed directly to this court.

Six objections in all are involved. The first is directed to levies to meet appropriations for: "Maintenance Department—Golf Courses and Winter Sports Section" ($373,-184); "Reconstruction and Additions to Existing Golf Courses" ($56,000); "Maintenance Department—Swimming Pool Section" ($149,960), "Swimming Pool Repairs" ($30,000). The second objection is to a levy to meet an appropriation of $25,475 for "Restoration at Construction Sites, Landscaping Golf Courses, Reforestation." These two objections will be discussed together.

The underlying basis of these objections is that the Forest Preserve Act (Ill. Rev. Stat. 1965, ch. 57½, pars. 5, 6) did not, at the time these taxes were levied, authorize the districts created under it to maintain and operate golf courses, swimming pools and winter sports facilities, and that the taxes levied to meet appropriations for expenditures for these purposes were unauthorized and illegal.

The relevant statutory authority of forest preserve districts as it existed when these taxes were levied is as follows: "* * * to acquire in fee simple in the manner hereinafter provided, and hold lands containing one or more natural forests or parts thereof or land or lands connecting such forests or parts thereof, or lands capable of being reforested, for the purpose of protecting and preserving the flora, fauna, and scenic beauties within such district, and to restore, restock, protect, and preserve the natural forests and said lands together with their flora and fauna, as nearly as may be, in their natural state and condition, for the purpose of the education, pleasure, and recreation of the public." (Ill. Rev. Stat. 1965, ch. 57½, par. 5.) "* * * to construct, lay out, improve and maintain wells, power plants, comfort stations, shelter houses, paths, driveways, roadways and other improvements and facilities in and through said forest preserves as they shall deem necessary or desirable for the use of such forest preserves by the public." Ill. Rev. Stat. 1965, ch. 57½, par. 6.

The District has engaged in all three of the challenged activities for many years—it has maintained golf courses for 48 years, and swimming pools and winter sports facilities since the early 1930's. Different justifications are advanced by the District, however, to support each activity, and they will be discussed separately. With respect to the golf courses, the District argues that "within the total planning objectives" of the District, "the golf courses constitute an essential use of the * * * land for forestry and conservation purposes. These lands are at present maintained as open space areas or buffer zones to protect other lands more advanced in their growth and development cycle. If these lands were not used as golf courses, they would have to be kept in a pure meadow state. The cost of this would be considerable compared to the cost of using the land as golf courses." The District's 1966 appropriation ordinance shows anticipated annual revenue of $450,000 from golf course fees. From 1965 to 1967, an annual average of 270,896 persons used the golf courses, and in 1967 a new golf course, opened that year, attracted 48,492 players.

The District also points out that only 884 acres, or .015 of the 56,896 acres it owns, are used for golf courses, and that more than 50 percent of the area of several of its golf courses consists of forests in their natural state. Apart from these considerations, the District urges that the maintenance of these facilities is responsive to the authority of the statute, which states that forest preserves are to perform their functions "for the purpose of the education, pleasure and recreation of the public."

The taxpayer relies upon the language of the statute, which does not refer to generalized purposes of education, pleasure and recreation of the public, but to the limited purpose of accomplishing those objectives through the preservation and restoration of natural forests, and their flora and fauna, in their natural condition. To demonstate that limited purpose he refers to the language of the original

statute, free of irrelevant, but distracting, subsequent amendments: " 'Any forest preserve district organized under this Act shall have the power to create forest preserves, and for that purpose shall have power to acquire, in the manner hereinafter provided, and hold lands containing one or more natural forests or parts thereof, for the purpose of protecting and preserving the flora and fauna and scenic beauties within such district, and to protect and preserve such lands as nearly as may be in their natural condition for the purpose of the education, pleasure, and recreation of the public.' Laws 1913, p. 387."

The taxpayer also relies upon the observations of this court in *Perkins* v. *Commissioners of Cook County* (1916), 271 Ill. 449. There the original statute was attacked on the ground that "the real purpose of the act was to create parks and pleasure grounds for the public." The court said: "While it is undoubtedly true that if the act is allowed to stand and is carried into effect the natural forests thereby preserved will have many of the characteristics of public parks that have been established under various laws, still we think that a fair reading of the whole of its sections shows that the primary purpose of such districts is to preserve and protect the natural forests, with their flora and fauna, in their natural state or condition, and that the matters of education, pleasure and recreation are subordinate to and merely incident to the preservation of such forests and their scenic beauties in their natural state." 271 Ill. at 469.

We are of the opinion that the objector is correct in his contention that the language of the statute did not, when these taxes were levied, authorize the district to maintain golf courses. The carefully prepared fairways, artificial sand traps, and bent grass greens which characterize golf courses are not, we think, compatible with the authority to preserve wooded areas in their natural condition.

Despite this conclusion, we are of the opinion that the

objection was properly overruled. It is clear from the record that the golf courses produce substantial revenue for the District—indeed the unchallenged estimates of income from the operation of the golf courses are substantially equal to, or exceed, the total amount to be expended in their upkeep and maintenance. From the record before us, therefor, it does not appear that the taxpayer has been in any manner injured. If the golf course operations were eliminated from the activities of the District, as the objector contends they should be, the saving thereby achieved would be offset by an equivalent loss of revenue. As pointed out in *People ex rel. Brenza* v. *Gilbert*, 409 Ill. 29, 38, "The objection to a levy should disclose that the taxpayer has been injured by what the authorities have done." In the present case, as in the *Gilbert* case, the maxim of *damnum absque injuria* applies.

While the operation of golf courses requires a significant alteration in the natural state of the forested lands, and so was not compatible with the statutory authority of the District when the taxes here involved were levied, different considerations, in our opinion, apply to the activities of the District with respect to winter sports and swimming pools. Expenditures for winter sports are included with the appropriation for maintenance of golf courses and are not further segregated in the District's appropriation ordinance, which does, however, show anticipated revenue in the sum of $4,000 from the rental of toboggans. The use of forested areas for winter sports—ice skating, sledding, tobogganing and skiing—is a normal use of such areas, which does not require significant alteration of their natural condition. Those uses, in our opinion, are entirely consistent with the purposes for which the District was created. The use of the waters within forested areas for swimming is similarly a natural use of those areas. The artificial modification that has taken place by the construction of swimming pools is explained by the District in terms of the importance of

preventing children from swimming in polluted rivers and creeks, and in eliminating the hazards that had accompanied swimming in natural quarries located on lands of the District. These uncontradicted explanations are adequate to justify the modification of natural conditions by the use of swimming pools. We are of the opinion, therefore, that the winter sports activities, as shown by this record, and the maintenance of swimming pools, fall within the powers granted to the District by statute.

Because we hold that the activities of the District with respect to swimming pools and winter sports are authorized by statute, and that the taxpayer has shown no financial injury resulting from the operation of the golf courses, it is unnecessary to analyze in detail the effect of two statutes relied upon by the District. The first of these, entitled "An Act to affirm certain acts of Forest Preserve Districts", was enacted in 1967, after the taxes involved in this case had been levied. It provides: "In all cases where any Forest Preserve District has heretofore constructed, maintained or operated one or more swimming pools, golf courses, playfields or other recreational facilities, such construction, maintenance or operation is hereby affirmed and declared to have been a proper and valid exercise of the corporate powers of any such Forest Preserve District incidental to those powers specifically granted to any such Forest Preserve District pursuant to 'An Act to provide for the creation and managment of Forest Preserve Districts,' approved June 27, 1913, as amended, notwithstanding that such construction, maintenance or operation was not specifically set forth or enumerated in such Act as a corporate power of any such Forest Preserve District." Ill. Rev. Stat. 1967, chap. 57½, par. 15r.

The second statute to which the District refers authorizes forest preserve districts to issue revenue bonds "to construct, equip, acquire, extend, improve, maintain, and operate recreational facilities, including but not limited

to natatoriums, swimming pools, ice skating rinks, tennis courts, golf courses, toboggan slides and ski areas, or any combination thereof * * *." This Act added sections 18.1 *et seq.* to the Forest Preserve Act and becomes effective on July 1, 1969.

Section 13 of the Forest Preserve Act authorizes, in addition to a levy for general corporation purposes, a levy "for constructing improvements and for the development of the forests and lands of such district * * *." (Ill. Rev. Stat. 1965, ch. 57½, par. 14.) The taxpayer contends that appropriations for the salaries of full-time engineers, landscape architects, and surveyors, as well as compensation for outside consultants, were improperly made under the District's Construction and Development Fund. His position is that they should have been charged to the Corporate Fund, and if they had been so charged, the levy for that fund would have exceeded the statutory limit. Relying solely on *People ex rel. Schlaeger* v. *Reilly Tar & Chemical Corp.* (1945), 389 Ill. 434, he argues that such expenses are proper Construction and Development Fund charges only if they relate to services performed on particular projects, and that since the challenged expenses are not of that type, they constitute general administrative expenses which should have been charged to the Corporate Fund.

In our opinion the taxpayer's arguments exaggerate the significance of the *Reilly* case, and overlook the nature of the Construction and Development Fund. The *Reilly* case concerned the appropriate allocation of a school district's expenses between its building fund and its educational fund. The school district had attempted to charge the expenses of its bureaus of purchase and engineering, and its finance and legal departments, to the building fund on a *pro rata* basis, in accordance with its estimate of the amount of time the personnel in each of its administrative units spent on building projects. The court pointed out that the building fund appropriations could be used only for the special purpose of

"building school buildings and matters incident thereto," and sustained the taxpayer's objection that the items in question were general operating expenses of the school district.

Contrary to the taxpayer's suggestion, the *Reilly* case does not hold that salaries of workmen are proper building fund items only if appropriated for specific construction projects. Rather, the thrust of that case is to require that expenses charged to each fund be directly related to its purpose defined by the legislature. The engineers, landscape architects and surveyors whose salaries are here questioned possess skills which are basic to the construction and development of forests and facilities of the District. The only evidence offered in the trial court showed that these employees perform tasks in furtherance of the limited purpose of the Construction and Development Fund. The 1966 ordinance makes a separate appropriation to the Corporate Fund for foresters and general maintenance personnel, and it does not appear that the specially skilled employees here involved are engaged in the general operation and upkeep of the District's facilities.

It is also apparent that the Construction and Development Fund is of a broader scope than the building fund considered in the *Reilly* case. Through a long history of enactment, interpretation, and re-enactment, the statutory authorization of a school building fund had acquired a special and somewhat artificial meaning. (See *People ex rel. Schlaeger* v. *Reilly Tar & Chemical Co.*, 389 Ill. 434, 442-46.) When that case was decided, expenditures from the building fund could be used only for expenses which had a direct and substantial relationship to work performed on a school building. Section 13 of the Forest Preserve Act, on the other hand, clearly authorizes a levy not only for "constructing improvements" but also conjunctively "for the development of the forests and lands of such district." Long-range planning is a necessary aspect of proper overall

development of forested lands and an appropriation used for that purpose is not incompatible with the statutory authorization of section 13. Consequently, the District's Construction and Development Fund properly included appropriations for the salaries of personnel whose services may not be restricted to an immediate construction project.

Two other objections relate to 1966 levies to meet appropriations to the Chicago Zoological Society for maintenance and operation of the Brookfield Zoological Park, and to the Chicago Horticultural Society for development of a botanic garden. Pursuant to statutory authority (Ill. Rev. Stat. 1965, ch. 57½, pars. 18, 20.01), the District has entered into a contract with each of the two not-for-profit Societies, by the terms of which the Society undertakes to operate the facility and the District undertakes to levy taxes, which "shall immediately, upon receipt by the District be turned over to the Society." In each case the Society itself pays, from funds derived from sources other than taxation, a substantial portion of the cost of operating the facility for which it is responsible.

The circumstances that give rise to these objections are the same as to both Societies, but they can, as the taxpayer suggests, be more easily understood in connection with the Botanic Garden Fund, which is of more recent origin than the Zoological Fund. The total 1966 Botanic Garden Fund appropriation was $1,925,683.11. Of this total, $825,683 was payable from the District's 1966 tax levy, and $1,100,-000 was payable by the Chicago Horticultural Society from funds not derived from taxation. The objection centers upon the following balance sheet items:

### ASSETS

Available for
Appropriation
Taxes Receivable—1965 Levy. .$653,173.16    $653,173.16

## LIABILITIES

To Be Appro-<br>priated For

Due Chicago Horticultural
  Society . . . . . . . . . . . . . . . . . .$653,173.16   $653,173.16

The contract between the District and the Chicago Horticultural Society was entered into on January 27, 1965, and the first tax levy for the fund was made in 1965. The 1965 taxes, however, did not go into collection until 1966, and so, as the taxpayer points out, "the Society could not have had any tax funds during 1965 for use in making expenditures during that year."

The taxpayer first contends that the sole item under "Liabilities" in the balance sheet is not a liability. He argues that there was no liability on the part of the District to turn over the 1965 taxes to the Society in accordance with its contract because "no liability is created until the District actually receives the tax monies from the County Treasurer. On January 1, 1966 there existed the likelihood that tax monies would be received from time to time during 1966 which the District would be obligated to turn over to the Society, but this anticipated future obligation was no different from purchases to be made during the year on open account by the District as to which a liability for payment would arise at the time of purchase, not on January 1 in anticipation of the purchase. In other words, the liability for turning over tax monies to be received from time to time during 1966 only arose during the year, when, as, and if tax monies were actually received by the District, and then only to the extent of such monies actually received."

Because there was no cash in the fund on January 1, 1966, representing 1965 tax collections, the taxpayer argues the fund had no liabilities, and that an amount equal to the taxes receivable, $653,173.16, should have been shown on

the balance sheet as surplus available for appropriation to meet 1966 expenses. He contends that the balance sheet for the Botanic Garden Fund should have been made out in the same manner as the balance sheet of the Corporate Fund which, he says, "shows taxes receivable for 1965 and prior years as an asset which enters into the surplus available for appropriation and which, in turn, is appropriated for the payment of current 1966 expenses, reducing the corporate fund tax levy by the amount of such surplus."

We are unable to accept this argument. The defect in its fundamental premise, that no liability would come into being until 1965 taxes were collected, can be illustrated by considering the situation that exists with respect to tax anticipation warrants. In the case of the District's Corporate Fund tax anticipation warrants, the amount of outstanding uncollected taxes is shown as an asset on the Corporate Fund balance sheet, and the amount of outstanding warrants issued in anticipation of those taxes is shown as a liability. This method of accounting the objector approves. Yet tax anticipation warrants are payable "in the numerical order of their issuance solely from the anticipated taxes when these anticipated taxes are collected and not otherwise." (Ill. Rev. Stat. 1965, ch. 146½, par. 2.) If, as the taxpayer contends, there is no liability to pay to the Society the taxes that have been levied for the Botanic Fund unless and until those taxes have been collected, it must also be true that there is no liability to pay tax anticipation warrants unless and until the taxes in anticipation of the collection of which the warrants were issued have been collected. In each case the liability to pay comes into being only "when, as, and if" the taxes are collected.

The logic of the taxpayer's argument that since no cash proceeds of 1965 tax collections were on hand on January 1, 1966, no liability existed, would lead also to the conclusion that no asset existed on that date. Both the asset and liability are contingent but that does not mean that they

are to be disregarded. In the balance sheet of the Corporate Fund, which the taxpayer approves, taxes receivable for 1965 and the levies of prior years in the sum of $4,338,-466.82 are shown. Against that amount are shown liabilities on account of tax anticipation warrants and interest in the sum of $2,607,019.03. There is also shown $750,000 due the Working Cash Fund. And those amounts are appropriated for those liabilities, and not "for the payment of current 1966 expenses."

The appropriation ordinance for the Corporate Fund unmistakably shows an appropriation to pay tax anticipation warrants and interest. The District contends that its Botanic and Horticultural Fund appropriation ordinances also show an appropriation to each Society for the amounts of 1965 taxes to be collected. The taxpayer asserts that those ordinances contain no such appropriations. 'If the question were material, we would agree with the taxpayer's contention. But the legal responsibility of the District to apply the proceeds of taxes, when collected, to the payment of warrants issued to anticipate the collection of those taxes does not depend upon a subsequent appropriation. No taxing body could escape its liability to apply the funds collected on account of taxes for prior years to the payment of outstanding tax anticipation warrants by the simple expedient of failing, in a subsequent year, to appropriate for their payment. (See, e.g., *Berwind, Inc.* v. *Chicago Park District* (1946), 393 Ill. 317.) The obligation to pay the warrants exists independently of the subsequent appropriation, just as the statutory obligation in the case of the two funds involved in the present case exists independently of the 1966 appropriation of the District.

The taxpayer argues that because no 1965 taxes were collected until 1966, "the Society could not have incurred or paid expenses out of tax funds during 1965, and when the 1965 taxes were collected in 1966, such funds obviously were used by the Society to pay expenses incurred in '1966."

Nothing in the record supports this conclusion. The record shows that each Society itself paid a substantial portion of the expenses of each fund with its own money, derived from sources other than taxation. The reimbursement of expenditures thus made in advance of the collection of taxes is no different from the payment of tax anticipation warants. It follows that the circuit court properly overruled the Botanic and Zoological Fund objections.

The remaining objection relates to loss and cost items involved in the objections already discussed. Since we hold that the circuit court properly overruled those objections, the loss and cost objection falls.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*