COMMONWEALTH EDISON COMPANY, Plaintiff-Appellant, v. THE PEOPLE *ex rel.* JOHN H. COFFMAN, County Treasurer and *ex officio* County Collector of Ogle County, Defendant-Appellee.

Second District   No. 2—02—0342

Opinion filed April 9, 2003.

Alan W. Cargerman, of Fearer, Nye, Ahlberg & Chadwick, of Oregon, for appellant.

Douglas P. Floski, State's Attorney, of Oregon, and Heidi A. Katz, of Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., and David T.B. Audley, of Chapman & Cutler, both of Chicago, for appellee.

JUSTICE O'MALLEY delivered the opinion of the court:

Plaintiff, Commonwealth Edison Company, appeals the judgment of the circuit court of Ogle County granting summary judgment in favor of relator, John H. Coffman, county treasurer and tax collector of Ogle County (defendant), and denying summary judgment to plaintiff. Plaintiff contends that the Byron Forest Preserve District (Forest Preserve) improperly levied taxes to retire certain bonds that were issued in violation of the Local Government Debt Reform Act (Debt Reform Act) (30 ILCS 350/1 *et seq.* (West 2000)) and the Downstate Forest Preserve District Act (Downstate Act) (70 ILCS 805/1 *et seq.* (West 2000)), and are therefore unlawful and void. We affirm.

In 1989, the Forest Preserve decided to acquire certain land and construct a golf course. On December 21, 1989, the board of commissioners of the Forest Preserve adopted Ordinance No. 893, authorizing the issuance of $3,525,000 of general obligation land development bonds (alternate revenue source), series 1989 of the district (1989 alternate bonds), pursuant to section 15 of the Debt Reform Act (30 ILCS 305/15 (West 2000)). The ordinance provided that individual $5,000 bonds with an issue date of December 30, 1989, were to be sold on the municipal bond market to raise the funds needed for the golf course. The bonds were to accrue semiannual interest as high as 9%, with $100,000 of the bonds maturing and fully payable on December 30, 1993; $125,000 on December 30, 1994, 1995, and 1996; $150,000 on December 30, 1997, and 1998; $175,000 on December 30, 1999, and 2000; and further staggered maturities for the remaining half of the $3,525,000 issue through December 30, 2009. The ordinance also provided that the indebtedness resulting from the bond issue would be payable from two sources. One source, called "pledged revenues," was the principal proceeds the Forest Preserve might realize from issuing general obligation bonds and from other Forest Preserve funds appropriated for such payment. The other source of payment, called "pledged taxes," was an *ad valorem* tax levied against the taxable property within the district.

The 1989 alternate bonds complied with section 15(b) of the Debt Reform Act (30 ILCS 305/15(b) (West 2000)). Section 15(b) requires publication of the ordinance authorizing the bond issuance and a notice of the Forest Preserve's intent to issue bonds. It allows the voters to petition for a referendum on the question of issuing the bonds, termed a "backdoor referendum." The voters in the Forest Preserve District did not seek a backdoor referendum in connection with the 1989 alternate bond issue.

In 1997, the Forest Preserve adopted Ordinance No. 97—7. The ordinance provided that the Forest Preserve would issue $900,000 of nonreferendum general obligation bonds (1997 G.O. bonds), of which $392,000 was earmarked to pay the principal and interest due on the maturity dates of December 30, 1997, and June 30, 1998, for the 1989 alternate bonds.

In June 1998, the Forest Preserve adopted Ordinance No. 98—2. The ordinance provided that the Forest Preserve would issue $3,120,000 of general obligation bonds, series 1998 (alternate revenue source) (1998 alternate bonds). The Forest Preserve issued the 1998 alternate bonds in order to raise money to refund the outstanding 1989 alternate bonds, thus enabling the Forest Preserve to restructure the Forest Preserve's debt incurred in developing the golf course. Once again, the ordinance provided that the indebtedness incurred in conjunction with the 1998 alternate bonds would be payable from two sources: general obligation bonds the Forest Preserve might issue and funds appropriated for the purpose (pledged revenues), and *ad valorem* taxes levied against taxable property within the district (pledged taxes). The 1998 alternate bonds were also issued in compliance with section 15(b) of the Debt Reform Act, and the voters did not seek a backdoor referendum.

On November 30, 1998, plaintiff filed a complaint objecting to the real estate taxes levied against its Ogle County property for the 1997 tax year. Plaintiff objected to the $392,000 of the 1997 G.O. bonds earmarked to refund the 1989 alternate bonds as improper under the Debt Reform Act.

On December 19, 1998, the Forest Preserve adopted Ordinance No. 98—10. The ordinance provided for the issuance of $1,395,000 of nonreferendum general obligation bonds (1998 G.O. bonds), of which $495,000 was earmarked as a revenue source to pay the principal and interest due on the 1998 alternate bonds on December 30, 1998, and June 30, 1999.

On November 8, 1999, plaintiff filed a complaint objecting to the portion of the 1998 G.O. bonds that were issued in order to provide a revenue source to refund the 1998 alternate bonds that were matur-

ing. Once again, plaintiff contended that the Forest Preserve had not followed the requirements of the Debt Reform Act.

On November 16, 1999, the Forest Preserve adopted Ordinance No. 99—6. The ordinance provided for the issuance of $1,452,000 of nonreferendum general obligation bonds (1999 G.O. bonds), of which $502,000 was allocated to provide a revenue source to pay the principal and interest due on the 1998 alternate bonds on December 30, 1999.

Also on that date, the Forest Preserve adopted Ordinance No. 99—7, which provided for the issuance of $53,000 of nonreferendum general obligation bonds bearing an issue date of June 23, 2000, and maturing on July 7, 2000 (2000 G.O. bonds). The $53,000 was allocated to pay the interest due on June 30, 2000, on the 1998 alternate bonds.

On November 15, 2000, plaintiff filed a third tax objection complaint. Plaintiff objected to that portion of the 1999 G.O. bonds allocated to pay the principal and interest accruing on the 1998 alternate bonds. Plaintiff also objected to the 2000 G.O. bonds. Plaintiff again contended that these bonds were illegally refunding the 1998 alternate bonds coming due on December 30, 1999, and June 30, 2000.

Defendant filed motions for summary judgment in each of the three tax objection actions. Plaintiff filed cross-motions for summary judgment. On December 12, 2001, the trial court heard the parties' arguments on the motions and cross-motions for summary judgment. On that date, the trial court issued its oral ruling, granting defendant's motions and denying plaintiff's motions for summary judgment. The trial court determined that, when the Forest Preserve adopted Ordinance No. 893, it specifically provided for funding via the issuance of general obligation bonds. The trial court concluded that the bonds to which plaintiff objected were not issued to refund the 1989 alternate bonds or the 1998 alternate bonds but were issued to provide a revenue source to pay off the 1989 and 1998 alternate bonds, as mandated by the Forest Preserve's Ordinance No. 893. On January 15, 2002, final orders were entered in each of the three tax objection actions. Plaintiff's motion to reconsider was denied and plaintiff timely appeals.

Plaintiff contends that the 1997, 1998, 1999, and 2000 G.O. bonds were unlawfully issued. Plaintiff argues that, pursuant to the terms of the Downstate Act, the Forest Preserve was required to submit the 1997-2000 G.O. bonds to its electorate in a referendum before the bonds could be lawfully issued. Plaintiff concludes that, because the bonds were issued without lawful authority, they are void and, consequently, the taxes levied by the Forest Preserve are invalid. We disagree.

■ We begin our analysis by first considering the familiar principles governing our review of a grant of a motion for summary judgment. Summary judgment is appropriate where the pleadings, depositions, admissions, affidavits,. and exhibits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2000); *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 291 (2000). We review the trial court's grant of summary judgment *de novo. Jones*, 191 Ill. 2d at 291. Our function on an appeal from the grant of summary judgment is limited to determining whether the trial court correctly determined that no genuine issue of material fact existed and, if that was the case, whether the trial court correctly entered judgment as a matter of law. *State Farm Insurance Co. v. American Service Insurance Co.*, 332 Ill. App. 3d 31, 36 (2002). Where the parties have filed cross-motions for summary judgment, they agree that there are no factual issues present and that the cause presents only legal issues to resolve. *State Farm*, 332 Ill. App. 3d at 36. The court, nevertheless, must determine for itself that there are no factual issues sufficient to preclude summary judgment, after which the court may determine the issues presented as questions of law. *State Farm*, 332 Ill. App. 3d at 36.

Plaintiff asserts that the 1997-2000 G.O. bonds were required to be issued in accordance with section 13 of the Downstate Act (70 ILCS 805/13 (West 1996)). Section 13 provides:

"The board of any forest preserve district organized hereunder may, for any of the purposes enumerated in this Act, borrow money upon the faith and credit of such district, and may issue bonds therefor. However, a district with a population of less than 3,000,000 may not become indebted in any manner or for any purpose to an amount including existing indebtedness in the aggregate exceeding 2.3% of the assessed value of the taxable property therein, as ascertained by the last equalized assessment for State and county purposes. No district may incur (i) indebtedness in excess of .3% of the assessed value of taxable property in the district, as ascertained by the last equalized assessment for State and county purposes, for the development of forest preserve lands held by the district, or (ii) indebtedness for any other purpose except the acquisition of land including acquiring lands in fee simple along or enclosing water courses, drainage ways, lakes, ponds, planned impoundments or elsewhere which are required to store flood waters or control other drainage and water conditions necessary for the preservation and management of the water resources of the District, unless the proposition to issue bonds or

otherwise incur indebtedness is certified by the board to the proper election officials who shall submit the proposition at an election in accordance with the general election law, and approved by a majority of those voting upon the proposition. *** Before or at the time of issuing bonds, the board shall provide by ordinance for the collection of an annual tax to pay the interest on the bonds as it falls due, and to pay the bonds as they mature." 70 ILCS 805/13 (West 1996).

Plaintiff argues that, because the bond issues for the 1997-2000 G.O. bonds were never submitted to a referendum, they violate the requirements of section 13 of the Downstate Act and are therefore void. We disagree.

The 1989 and 1998 alternate bonds were issued in accordance with section 15 of the Debt Reform Act (30 ILCS 350/15 (West 2000)). Section 15 provides:

"Whenever revenue bonds have been authorized to be issued pursuant to applicable law or whenever there exists for a governmental unit a revenue source, the procedures set forth in this Section may be used by a governing body. General obligation bonds may be issued in lieu of such revenue bonds as authorized, and general obligation bonds may be issued payable from any revenue source. Such general obligation bonds may be referred to as 'alternate bonds'. Alternate bonds may be issued without any referendum or backdoor referendum except as provided in this Section, upon the terms provided in Section 10 of this Act without reference to other provisions of law, but only upon the conditions provided in this Section. Alternate bonds shall not be regarded as or included in any computation of indebtedness for the purpose of any statutory provision of limitation except as expressly provided in this Section.

Such conditions are:

(a) Alternate bonds shall be issued for a lawful corporate purpose. If issued in lieu of revenue bonds, alternate bonds shall be issued for the purposes for which such revenue bonds shall have been authorized. If issued payable from a revenue source in the manner hereinafter provided, which revenue source is limited in its purposes or applications, then the alternate bonds shall be issued only for such limited purposes or applications. Alternate bonds may be issued payable from either enterprise revenues or revenue sources, or both.

(b) Alternate bonds shall be subject to backdoor referendum. The provisions of Section 5 of this Act [detailing the procedures of a backdoor referendum] shall apply to such backdoor referendum, together with the provisions hereof. ***

(c) To the extent payable from enterprise revenues, such revenues shall have been determined by the governing body to be sufficient to provide for or pay in each year to final maturity of such alternate bonds all of the following: [costs of operation or maintenance of the utility or enterprise, debt service, fund or account requirements, contractual or tort obligations, and a reserve amount.] *** The conditions enumerated in this subsection (c) need not be met for that amount of debt service provided for by the setting aside of proceeds of bonds or other moneys at the time of the delivery of such bonds.

(c—1) In the case of alternate bonds issued as variable rate bonds (including refunding bonds), debt service shall be projected based [on the requirements enumerated in subsection (c—1)]. ***

(d) The determination of the sufficiency of enterprise revenues or a revenue source, as applicable, shall be supported by reference to the most recent audit of the governmental unit ***. ***

(e) The enterprise revenues or revenue source, as applicable, shall be in fact pledged to the payment of the alternate bonds; and the governing body shall covenant, to the extent it is empowered to do so, to provide for, collect and apply such enterprise revenues or revenue source, as applicable, to the payment of the alternate bonds and the provision of not less than an additional.25 [*sic*] times debt service." 30 ILCS 350/15 (West 2000).

"Revenue source" is defined as "a source of funds, other than enterprise revenues, received or available to be received by a governmental unit and available for any one or more of its corporate purposes." 30 ILCS 350/3(*l*) (West 2000).

Ordinance No. 893 provided that the Forest Preserve would:

"issue its general obligation bonds or notes from time to time to the fullest extent permitted by law, including Section 13 of the [Downstate Act], and that the [Forest Preserve would] appropriate its funds annually and in such amounts and in a timely manner so as to provide for the payment of the Bonds and not less than an additional .25 times debt service. The principal proceeds of such Bonds or notes, together with such other funds of the [Forest Preserve] as may be lawfully available and annually appropriated for such purpose (collectively, the 'Pledged Revenues'), shall be deposited into the Bond Fund."

Ordinance No. 98—2 contains a virtually identical provision. By these provisions, the Forest Preserve pledged future general obligation bonds as a revenue source by which to fund the 1989 and 1998 alternate bonds. The language of section 3(*l*) of the Debt Reform Act is broad enough to encompass the issuance of general obligation bonds to provide such a revenue source for the 1989 and 1998 alternate bonds.

The Forest Preserve's use of the 1997-2000 G.O. bonds to provide a revenue source for the 1989 and 1998 alternate bonds was specified in the enabling ordinance for each bond issue as well as authorized under the Debt Reform Act. Plaintiff's argument that the 1997-2000 G.O. bonds were issued unlawfully is unavailing.

Plaintiff argues that the use of general obligation bonds to refund the 1989 and 1998 alternate bonds violates section 11 of the Debt Reform Act (30 ILCS 350/11 (West 2000)). Section 11 states that "[g]eneral obligation bonds shall not be issued to refund revenue bonds or alternate bonds except as expressly permitted by applicable law." 30 ILCS 350/11 (West 2000). Plaintiff urges that this prohibition makes illegal the issuance of those portions of the 1997-2000 G.O. bonds used to pay the principal and interest of the 1989 and 1998 alternate bonds.

■ Plaintiff's argument misses the mark. The 1997-2000 G.O. bonds were issued in order to provide the revenue source specified in Ordinance Nos. 893 and 98—2. Because the bonds are plainly "revenue sources" as contemplated by section 3($l$) of the Debt Reform Act, they were properly issued.

In addition, we note that plaintiff's argument that the 1997-2000 G.O. bond issues needed to be subjected to a referendum is without merit. Contrary to plaintiff's argument, section 13 of the Downstate Act requires a referendum only if the aggregate indebtedness exceeds 0.3% of the assessed valuation of the taxable property in the district. It is undisputed that the Forest Preserve's indebtedness did not exceed 0.3% of the total assessed valuation of the taxable property in the district. Therefore, the Forest Preserve properly could issue the 1997-2000 G.O. bonds without recourse to a referendum. Furthermore, plaintiff does not attack the issuance of the 1989 and 1998 alternate bonds, and it is undisputed that they were issued in accord with all of the provisions and requirements of section 15 of the Debt Reform Act.

Plaintiff argues that the 1997-2000 G.O. bonds were not incurred for the development of forest preserve lands, citing *People ex rel. Kucharski v. McGovern*, 42 Ill. 2d 119, 121-23 (1969). In *Kucharski*, the court determined that the relevant provisions of "An Act to provide for the creation and management of forest preserve districts" (Ill. Rev. Stat. 1965, ch. 57½, pars. 5, 6) did not authorize the Cook County Forest Preserve District to maintain a golf course. *Kucharski*, 42 Ill. 2d at 123. There was, however, at all times relevant to the present case, a provision in the Downstate Act that provided that a forest preserve district could operate, maintain, and acquire golf courses. See, *e.g.*, Ill. Rev. Stat. 1989, ch. 96½, par. 6335. That a 1969 case found the maintenance of golf courses not to be authorized by statute

is of no moment where the statute under which the Forest Preserve here was operating expressly provided that a forest preserve district could acquire and operate a golf course. Plaintiff's reliance on *Kucharski* is misplaced. Further, that the Forest Preserve did not proceed according to the provisions of the sections of the Downstate Act dealing with the acquisition of golf courses is also immaterial because the Forest Preserve followed the requirements of the Debt Reform Act in procuring the funds necessary to enable it to acquire the land and develop the golf course. The Debt Reform Act was intended to modernize the ability of local governmental units to incur indebtedness and to provide a supplemental means for them to do so. 30 ILCS 350/2 (West 2000). The Forest Preserve could properly avail itself of the benefits of the Debt Reform Act while pursuing a proper corporate purpose as enumerated in the Downstate Act.

Plaintiff also disputes as unsound defendant's argument below, that its contractual rights are unconstitutionally impaired if the 1997-2000 G.O. bonds were found to be invalid. As we have found that the 1997-2000 G.O. bonds were validly issued, we need not address this argument.

For the foregoing reasons, the judgment of the circuit court of Ogle County is affirmed.

Affirmed.

McLAREN and GROMETER, JJ., concur.